**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **AFTAB A. KHAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 21-CV-4827** |
| **v.** | ) | |
| | ) | |
| **HCL AMERICA INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |


**DEFENDANT'S BRIEF IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

ATTORNEYS FOR DEFENDANT

Thomas A. Lidbury
Ebony C. Smith
Hilarie M. Carhill
OGLETREE, DEAKINS, NASH, SMOAK
 & STEWART, P.C.
155 N. Wacker Drive, Suite 4300
Chicago, IL 60606
P 312.558.1220
F 312.807.3619

tom.lidbury@ogletree.com/312-558-1230
ebony.smith@ogletree.com/312-558-1252
hilarie.carhill@ogletree.com/312-558-1242


May 22, 2023

### TABLE OF CONTENTS

TABLE OF AUTHORITIES....................................................................................................ii

INTRODUCTION....................................................................................................................1

STATEMENT OF FACTS.........................................................................................................1

    A. MR. KHAN & THE LABELING GROUP............................................................................1

    B. MR. KHAN'S SUPERVISORS..........................................................................................1

    C. MR. KHAN'S WORKING RELATIONSHIPS WITH BAXTER...............................................2

    D. MR. KHAN'S PIP..........................................................................................................3

    E. BAXTER'S DECISION TO REMOVE MR. KHAN................................................................4

    F. CONTINUATION AND TERMINATION OF THE PIP............................................................4

    G. INTERNAL SEARCH FOR ASSIGNMENT & TERMINATION.................................................5

    H. POST-TERMINATION DISCRIMINATION CLAIMS.............................................................6

    I. MS. ELLIOTT..............................................................................................................7

    J. MR. BELMONT............................................................................................................7

    K. MR. CHAPAIN............................................................................................................8

ARGUMENT...........................................................................................................................8

I.      There Is No Evidence Of National Origin Discrimination ...........................................8

    A.      There Is No Evidence Of Intentional Discrimination Based On American
            National Origin ...........................................................................................9

          1.      There Is No Direct Or Circumstantial Evidence .........................................9

          2.      There Is No Evidence Under The McDonnell Douglas Framework ........10

    B.      There Is No Evidence Of A Disparate Impact On Mr. Khan ...............................12

II.    There Is No Evidence Of Age Discrimination ...........................................................15

    A.      There Is No Evidence That A Decision-Maker Had An Ageist Bias .................16

    B.      Mr. Khan's Conspiracy Theory Is Pure Speculation .........................................16

    C.      Mr. Khan's "Cat's Paw" Fable Has Neither Monkey Nor Cat.............................17

CONCLUSION ......................................................................................................................19

## TABLE OF AUTHORITIES

**Cases**

*Adams v. City of Indianapolis*, 742 F.3d 720 (7th Cir. 2014) ....................................................9, 14

*Adams v. Lucent Technologies, Inc.*, 284 Fed.Appx. 296 (6th Cir.2008) ....................................14

*Allen v. City of Chi.*, 351 F.3d 306 (7th Cir. 2003) .......................................................................14

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) .........................................................................8

*Carpenter v. Bd. of Regents of Univ. of Wis. Sys.*, 728 F.2d 911 (7th Cir. 1984) .......................15

*City of Joliet v. New W., L.P.*, 825 F.3d 827 (7th Cir. 2016) .......................................................15

*Dey v. Colt Const. & Development Co.*, 28 F.3d 1446 (7th Cir.1994) .........................................11

*Ellis v. CCA of Tennessee LLC*, 650 F.3d 640 (7th Cir. 2011) ....................................................8

*Espinoza v. Farah Mfg. Co.*, 414 U.S. 86 (1973) .....................................................................8, 13

*Farrell v. Butler University*, 421 F.3d 609 (7th Cir. 2005) ..........................................13, 14, 15

*Fortino v. Quasar Co., a Div. of Matsushita Elec. Corp. of Am.*, 950 F.2d 389 (7th
   Cir.1991) ....................................................................................................................................13

*Grubbs v. Housing Authority of Joliet*, 1997 WL 281297 (N.D. Ill. May 20) .............................14

*Gullett v. Town of Normal*, 156 Fed.Appx. 837 (7th Cir. 2005) .................................................13

*Gunville v. Walker*, 583 F.3d 979 (7th Cir. 2009) .......................................................................18

*Hasan v. Foley & Lardner LLP*, 552 F.3d 520 (7th Cir. 2008) ..................................................10

*Jordan v. Evans*, 2020 WL 6624794 (N.D.Ill. Nov. 11) .............................................................15

*Konowitz v. Schnadig*, 965 F.2d 230 (7th Cir.1992) ..................................................................17

*Lugg v. Sutton*, 2021 WL 3673824 (C.D. Ill. Aug. 18) ..............................................................16

*Majors v. Gen. Elec. Co.*, 714 F.3d 527 (7th Cir. 2013) ...............................................................8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...................................8

*McDonnell Douglas v. Green*, 411 U.S. 792 (1973) ....................................................9, 10, 12, 16

*McQueen v. City of Chicago*, 2014 WL 1715439 (N.D. Ill. April 30) ........................................14

*Melendez v. Illinois Bell Telephone Co.*, 79 F.3d 661 (7th Cir. 1996) ........................................15

*Mills v. First Federal Savings And Loan Assoc. of Belvidere*, 83 F.3d 833 (7th Cir. 1996) ..11, 12

*Murray v. Chicago Transit Authority*, 252 F.3d 880 (7th Cir. 2001) ....................................16-18

*Noreuil v. Peabody Coal Co.*, 96 F.3d 254 (7th Cir.1996) .........................................................14

*Ortiz v. Werner Enterprises*, 834 F.3d 760, 764 (7th Cir. 2016) .................................................9

*Raymond v. Ameritech*, 442 F.3d 600 (7th Cir. 2006) ..........................................................10, 12

*Soyinka v. Franklin Collection Services*, 2022 WL 900161 (N.D. Ill. March 27) ......................18

*Tolson v. City of Chicago*, 2016 WL 1043326 (N.D. Ill. March 16) ..........................................16

*Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977 (1988) ...........................................................14

*Woods v. City of Berwyn*, 803 F.3d 865 (7th Cir. 2015) .......................................................12, 17


**Rules & Statutes**

Fed. R. Civ. P. 56.............................................................................................................................8

Title VII, 42 U.S.C. §2000e et seq. ...........................................................................................8, 13

INTRODUCTION

Defendant, HCL America Inc. ("HCL") is entitled to summary judgment because there is no evidence to support Plaintiff, Aftab Khan's claims that he was terminated for being old or American. His employment terminated after HCL's client ejected him from its project for incompetence and he failed a Performance Improvement Plan ("PIP"). Mr. Khan does not raise a fact question about the bias of any decision maker.

STATEMENT OF FACTS

A.

MR. KHAN & THE LABELING GROUP

Mr. Khan was employed by HCL, and embedded within HCL's client, Baxter International, Inc. ("Baxter"), on various projects from 2015 through April 3, 2020. LR 56.1 ¶1. In about June or July 2019 Mr. Khan was assigned to the Labeling Group where his new supervisors were Michael Belmont and Prakash Chapain. *Id.* This was the result of a reorganization by which the group that Mr. Khan had been assigned to was merged into Mr. Belmont's group. *Id.* The Labeling Group was tasked with redlining drug labels, *i.e.*, proposing revisions to bring Baxter's labels into compliance with new EU regulations that were coming into effect. *Id.*

B.

MR. KHAN'S SUPERVISORS

Mr. Belmont is a Regional Director for HCL. LR 56.1 ¶2. Mr. Belmont oversees a large, long term program for HCL's client, Baxter. *Id.* The program includes approximately forty HCL employees physically embedded within Baxter performing work in nine different work streams. *Id.* One of those work streams is the Labeling Group, comprised of approximately seven HCL employees. *Id.* As the ultimate manager of the Labeling Group, Mr. Belmont understood the work and could independently evaluate the performance of the team. *Id.* However, Mr. Belmont

1

generally did not observe the work of the Labeling Group on a daily basis but rather relied on Mr. Chapain to update him on the Labeling Group's performance. *Id.*

From 2019 through 2022, Mr. Chapain was the Project Manager overseeing the Labeling Group. LR 56.1 ¶3. As the Project Manager, Mr. Chapain distributed work and managed the team toward the end goals. *Id.* He did not directly redline labels or daily review the team's work. *Id.* However, he was well versed in Baxter's established processes for redlining. *Id.*

C.

MR. KHAN'S WORKING RELATIONSHIPS WITH BAXTER

The HCL redliners, including Mr. Khan, worked on site and interacted directly with their Baxter counterparts, presenting their work product to them in in-person meetings. LR 56.1 ¶4. Mr. Chapain was rarely in attendance at those meetings given that he was not responsible for the substance of the specific redlining being discussed. *Id.*

When Mr. Khan initially joined the relining team Baxter's labeling subject matter expert ("SME") was Michael Chellson. LR 56.1 ¶5. Mr. Chellson provided Mr. Khan with substantial one-on-one attention and guidance on his redlining assignments. *Id.* Mr. Khan felt that Mr. Chellson was very capable and they got on well. *Id.*

In January 2020, Baxter terminated Mr. Chellson. LR 56.1 ¶6. Baxter's Cheryl Bork, who had been above Mr. Chellson, took over his daily management of the HCL redlining team. *Id.* Mr. Khan did not believe Ms. Bork was capable of providing him the substantive guidance he needed on his assignments. *Id.* While Mr. Khan describes his working relationship with Mr. Chellson as "very good," he describes his working relationship with Ms. Bork as "professional." *Id.* Mr. Khan denies any knowledge that Ms. Bork was dissatisfied with his work. *Id.*

Ms. Bork was, in fact, unsatisfied with Mr. Khan's work. LR 56.1 ¶7. Beginning in late 2019, Ms. Bork informed Messrs. Chapain and Belmont that Mr. Khan's work performance was

an issue.  *Id.*  On one notable occasion in or around February 2020 Mr. Khan was slated to run a meeting with the Baxter team but he did not show up.  *Id.*  On another occasion Mr. Khan was supposed to present to the Baxter stakeholders and was unable to effectively do so.  *Id.*  Mr. Khan admits that the Baxter employees overseeing the redlining team sent back "everything" to "retouch" and "rework" due to "technical error[s]," so much so that Mr. Khan proposed to Mr. Chapain the adoption of a new "buddy system" in which his work would be more thoroughly reviewed and fixed by peers before being exposed to scrutiny at Baxter.  *Id.*  Mr. Khan admits to refusing to redline labels as he was directed per Baxter's established process because he believed he knew better than Baxter.  *Id.*  ("And I would say no, I will not follow this template because this template is not aligned according to the regulation").  Ms. Bork repeatedly raised with Messrs. Belmont and Chapain her escalating dissatisfaction with Mr. Khan's work.  *Id.*

D.

MR. KHAN'S PIP

On March 9, 2020, Mr. Khan was placed on a PIP due to Ms. Bork's expressed dissatisfaction and Mr. Belmont's consultation with Lynne Elliott, an HCL Human Resources Manager.  LR 56.1 ¶8.  HCL utilizes PIPs in an effort to rehabilitate and retain struggling employees.  *Id.*  Messrs. Belmont and Chapain met with Mr. Khan on March 10, 2020 to review their expectations.  *Id.*  Mr. Belmont believed that Mr. Khan initially accepted the PIP with a positive attitude.  *Id.*  Mr. Chapain did not wish to be but he was tasked with administering it.  *Id.*

On March 12, 2020, Mr. Khan emailed Mr. Belmont to allege that on March 11, 2020 Mr. Chapain told him to "consider himself out from HCL-Baxter" and that the PIP is "just a stage show."  LR 56.1 ¶9.  Ms. Elliott's contemporaneous notes reflect that Mr. Chapain denied making the alleged remarks.  *Id.*  Mr. Chapain no longer recalls the conversation but believes he said no such thing.  *Id.*  Nor did he believe the PIP was a stage show.  *Id.*

3

In reaction to Mr. Khan's accusatory email, Mr. Belmont directed Mr. Chapain to "straighten this out" with Mr. Khan. LR 56.1 ¶10. And on March 12 or 13, 2020, Ms. Elliott had discussions with Mr. Chapain and with Mr. Khan. *Id.* Ms. Elliott assured Mr. Khan orally and in writing that his PIP would be conducted "fairly and properly" and "based on performance." *Id.*

### E.
### BAXTER'S DECISION TO REMOVE MR. KHAN

Also on March 12, 2020, Ms. Bork followed up the "numerous discussions" that began in "Q4 2019" with a formal written email directing that Mr. Khan be "removed immediately" because he is "incapable of doing his work by himself" and "without multiple issues and errors." LR 56.1 ¶11. Ms. Bork, as the client representative overseeing the Labeling Group, had the power to remove any HCL employee she wished from her project. *Id.*

### F.
### CONTINUATION AND TERMINATION OF THE PIP

While Ms. Bork could and did remove Mr. Khan from her project with Baxter, he remained an HCL employee. LR 56.1 ¶12. That left Mr. Khan both ineligible for a PIP, for lack of an active client assignment, and ineligible for reassignment to another client project, for lack of completion of the PIP. *Id.* Ms. Elliott made an exception to allow him to continue with the PIP in an administrative role, *i.e.*, on HCL's dime. *Id.*

Mr. Khan' first PIP deliverable was late and incorrect. LR 56.1 ¶13. Mr. Khan resisted performing the second PIP assignment. *Id.* There were multiple email exchanges on or around March 18, 2020 between Mr. Khan and Mr. Chapain in which Mr. Khan exhibited an inability to understand the assignment. *Id.* Mr. Khan attributes his inability to understand the assignment to the purported incompetence of Mr. Chapain. *Id.* A meeting was then scheduled with Messrs. Khan, Belmont and Chapain attending in person and Ms. Elliott participating by phone. *Id.*

At that meeting, on or about March 23, 2020, Mr. Belmont personally observed Mr. Khan behaving inappropriately, including argumentativeness, yelling and insubordination. LR 56.1 ¶14. Mr. Belmont observed Mr. Khan obdurately refusing to follow the established process for redlining drug labels that everyone else follows without deviation and being unable to complete a simple task in a reasonable time. *Id.* ("he doesn't want to follow that process" that "everyone else in the group follows" because "he has a different way"). Mr. Belmont had the expertise to determine Mr. Khan's PIP performance for himself and he did independently conclude that it was deficient. *Id.* Mr. Belmont and Ms. Elliott both personally observed Mr. Khan's argumentativeness, yelling and insubordination. *Id.* Mr. Khan's behavior was so inappropriate and unconstructive that Ms. Elliott ended the PIP meeting and took the decision to abandon the PIP midstream. *Id.*

## G.

### INTERNAL SEARCH FOR ASSIGNMENT & TERMINATION

Despite Mr. Khan's failure of the PIP process, and thus ineligibility for another assignment within HCL, Ms. Elliott determined to post Mr. Khan in an internal system as Advanced Available For Deployment ("AAFD"), sometimes called the "bench," showing him to all HCL managers as eligible for another assignment within HCL. LR 56.1 ¶15. Being in AAFD status meant that Mr. Khan's employment would be slated to end in two weeks (April 3, 2020) unless another assignment could be found for him. *Id.* During the "bench" period, in addition to being posted internally as available for other assignments, the Workforce Planning Committee actively sought another assignment for Mr. Khan, Mr. Khan himself could and did reach out to HCL and Baxter contacts to try to find an assignment and Mr. Belmont also reached out to colleagues in an effort to find another assignment within HCL for Mr. Kahn. *Id.* No assignment was found for him and therefore his employment terminated effective April 3, 2020. *Id.*

Because of Mr. Khan's abrupt ejection from the team his active assignments were redistributed to existing resources. LR 56.1 ¶16. About six weeks later Mr. Belmont made the decision to transfer Aaron Baynard onto the redlining team to fill the opening left by Mr. Khan's termination. *Id.* Mr. Baynard was an American approaching or in his fifties. *Id.*

H.

POST-TERMINATION DISCRIMINATION CLAIMS

After Mr. Khan's termination, for the first time, he claimed discrimination on the basis of age and national origin. LR 56.1 ¶17. He is 58 years of age, culturally Indian, hails from Pakistan and is now a U.S. citizen. *Id.* He can identify no comparator – of any age, national origin or visa status – who, like him, was thrown off of a team by a client for incompetence, failed a PIP, and yet remained employed. *Id.* He identifies co-workers he claims were treated better in various working terms but he does not know their age or national origin or why they were allowed those terms and he never even wanted or asked for those terms himself. *Id.*

Prior to Mr. Khan's termination, though lightning quick to raise other allegations such as his "stage show" allegations, he never asserted to anyone that Mr. Chapain had made derogatory age-related comments. LR 56.1 ¶18. He now claims that such comments started in November or December 2019, when Mr. Chapain suddenly began singling him out in redlining team meetings with derogatory age-related comments. *Id.* Even now Mr. Khan admits that neither Mr. Belmont nor Ms. Bork said anything at all about his age. *Id.*

As to national origin and visa status, Mr. Khan even now admits that no one ever said a word about that, including Mr. Chapain, Mr. Belmont, Ms. Elliott and Ms. Bork. LR 56.1 ¶19.

Mr. Khan offers no evidence whatsoever of any bias on the part of anyone but Mr. Chapain, who did not and could not remove him from the Labeling Group or fire him from HCL. LR 56.1 ¶20. In lieu of such evidence he speculates that Mr. Chapain drew others into a conspiracy to

6

terminate him because of his age and national origin. *Id.* ("part of the stage show," "in on the fix," and "out to get [me]"). He admits to having no basis for this speculation. *Id.* All he can offer is the hearsay ("according to the people who was talking") that Mr. Chapain and Ms. Bork were "friends outside of work." *Id.* He compounds this speculation with the further extrapolation that it is "possible" that Mr. Chapain also recruited Mr. Belmont and Ms. Elliott into the "conspiracy to get rid of old and American people." *Id.*

## I.

### MS. ELLIOTT

Ms. Elliott is a sixty-three year old native born American. LR 56.1 ¶21. HCL has no policy preference for hiring visa holders and she generally does not know employees' visa status. *Id.* Prior to Mr. Khan's post-termination claims, she did not know his national origin, visa status or age. *Id.* She assumed he was of Indian national origin. *Id.* He never told her that Mr. Chapain had made derogatory comments about his age or visa status. *Id.*

## J.

### MR. BELMONT

Mr. Belmont is a native born U.S. citizen in his late fifties. LR 56.1 ¶22. Mr. Belmont did not know or suspect that Mr. Khan's national origin was American. *Id.* He does not know whether Mr. Khan is a U.S. citizen. *Id.* He often does not know the citizenship, visa status or national origin of those he supervises. *Id.* He happens to know eleven subordinates are on visas and estimates that thirty percent probably are on visas. *Id.* He does not know the reason this number of visa holders work for HCL. *Id.* He does not know if visa holders are paid less than other qualified candidates or if that is a reason they are hired. *Id.* To the extent he is involved in hiring decisions he is interested in candidates' experience and not how much money they make. *Id.*

Before Mr. Khan's termination, He was unaware that Mr. Chapain actually or allegedly made age-related remarks to Mr. Khan.  *Id.*

## K.

### MR. CHAPAIN

Mr. Chapain hails from Nepal, has never held an H1 visa, became a U.S. citizen in 2018, and is forty years of age.  LR 56.1 ¶23.  Based on his interactions he assumed that Mr. Khan was of Indian or South Asian national origin.  *Id.*  He denies making any of the age-related comments that Mr. Khan belatedly asserts he made.  *Id.*  He does not know whether Mr. Khan is a U.S. citizen or visa holder.  *Id.*  He denies telling Mr. Khan that visa holders generally are younger or less expensive and does not know if this is so.  *Id.*  Nor did he know how much HCL paid Mr. Khan or anyone else on the redlining team.  *Id.*

### ARGUMENT[1]

## I.    There Is No Evidence Of National Origin Discrimination.

There is no evidence that HCL discriminated against Mr. Khan because of his American national origin.  The term "national origin" in Title VII means the "country from which you or your forebears came."  *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 89 (1973).  Mr. Khan is culturally Indian, was born in Pakistan and is now an American.  LR 56.1 ¶23.  His forebears came from

---

[1] Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  There is no genuine issue of fact unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  To avoid summary judgment the non-movant must "make a showing sufficient to establish the existence of" each "element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 646 (7th Cir. 2011).  The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532-33 (7th Cir. 2013).  However, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

British India, divided in 1947 into India and Pakistan.[2]  LR 56.1 ¶17.  Of his many options, Mr. Khan predicates his claim on an alleged bias against him as an American.  There is no evidence of this whatsoever under the direct method, the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), or disparate impact.

### A. There Is No Evidence Of Intentional Discrimination Based On American National Origin.

Mr. Khan has no disparate treatment claim because no one knew, suspected, cared or commented on his national origin.  LR 56.1 ¶¶21-23.  To defeat summary judgment on a disparate treatment claim a plaintiff must "come forward with sufficient direct or circumstantial evidence that the [employer's] decisions were intentionally discriminatory or make an indirect case of discrimination under the burden-shifting framework established in *McDonnell Douglas.*"  *Adams v. City of Indianapolis*, 742 F.3d 720, 735 (7th Cir. 2014).  Mr. Khan cannot do so.

### 1. There Is No Direct Or Circumstantial Evidence.

Mr. Khan's national origin claim fails because there is no evidence that anyone from HCL who was even arguably involved in his PIP or termination knew, suspected or cared that he was of American national origin.  Mr. Khan must present evidence – direct, circumstantial, or both – from which a "reasonable juror could conclude that [he] would have kept his job if he had been of a different [national origin]."  *Ortiz v. Werner Enterprises*, 834 F.3d 760, 764 (7th Cir. 2016).  There is none.  Mr. Chapain, Mr. Belmont and Ms. Elliott are all of American national origin.  LR 56.1 ¶¶21-23.  None knew Mr. Khan's national origin.  *Id.*  Mr. Khan does not claim any of them attributed his termination to his national origin, whatever they guessed it was, or made any comments at all about his, or anyone else's, national origin.  LR 56.1 ¶19.

---

[2] See, https://www.bbc.co.uk/newsround/46428985.

Nor can Mr. Khan identify any employee of any other national origin who was similarly situated and received better treatment. LR 56.1 ¶17. He identifies co-workers who he claims were treated better in various respects – allowed to work remotely, different hours, or with multiple teams – but he does not know their national origin, he has "no idea" why they were allowed those things, and he never wanted or requested to do any of those things himself. *Id.* He can identify no comparator of any national origin who, like him, was thrown off of a team by a client for incompetence and failed a PIP for insubordination, and yet remained employed. *Id.*

There is no evidence at all he was intentionally discriminated against because of his national origin.

## 2. There Is No Evidence Under The *McDonnell Douglas* Framework.

Mr. Khan also fails the *McDonnell Douglas* framework because he was not meeting HCL's legitimate expectations and there is no comparator of any national origin who, like him, was thrown off of a team by a client for incompetence and failed a PIP, and yet remained employed.

Under the *McDonnell Douglas* framework there are "four elements of [Mr. Khan's] prima facie case: (1) []he is a member of a protected class; (2) []he was performing at a level that met h[is] employer's legitimate expectations; (3) []he was subject to an adverse employment action; and (4) []he was treated differently than a similarly situated person outside h[is] protected classes." *Raymond v. Ameritech*, 442 F.3d 600, 610 (7th Cir. 2006) (citation omitted). If Mr. Khan could establish a prima facie case "then the burden would shift to [HCL] to 'articulate some legitimate, nondiscriminatory reason' for [Mr. Khan's] termination." *Id.* Then it would be Mr. Khan's burden to prove this "justification is pretextual." *Id.* "As the plaintiff, it is [Mr. Khan] who bears the ultimate burden of proof. *Id.*

Mr. Khan cannot make out a prima facie case because he was not performing adequately and he can identify no comparator who was treated better.

First, he cannot show that he was performing consistent with HCL's legitimate expectations. His performance was so bad that Baxter, HCL's client, ejected him from its project. LR 56.1 ¶¶8, 11. He then failed a PIP. LR 56.1 ¶¶12-14. Mr. Khan's "self-serving" opinion that he was doing great and his clients and supervisors are all incompetent is, apart from laughable, entirely inadequate to defeat summary judgment. *Mills v. First Federal Savings And Loan Assoc. of Belvidere*, 83 F.3d 833 (7th Cir. 1996) (to defeat summary judgment "Mills 'must do more than challenge the judgment of [her] superiors through [her] own self-interested assertions,'" citation omitted); *Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1460 (7th Cir.1994) ("An employee's self-serving statements about his ability ... are insufficient to contradict an employer's negative assessment of that ability.").

Mr. Khan's self-serving opinion of himself is wholly insufficient in the face of the overwhelming evidence of his poor performance. HCL's client, Baxter through Ms. Bork, determined that Mr. Khan was "incapable of doing his work by himself" and "without multiple issues and errors." LR 56.1 ¶¶8, 11. In the ensuing PIP process, Mr. Belmont independently assessed that Mr. Khan was unable or unwilling to perform the PIP. LR 56.1 ¶¶12-14. Mr. Belmont had the expertise to determine Mr. Khan's PIP performance for himself and he did independently conclude that it was deficient. *Id.* In addition to incompetence, Mr. Belmont and Ms. Elliott both personally observed Mr. Khan's argumentativeness, yelling and insubordination. *Id.* Mr. Khan's behavior was so inappropriate and unconstructive that Ms. Elliott took the decision to abandon the PIP midstream. *Id.* In light of this "abundant evidence that []he was falling short

11

of h[is] employer's legitimate expectations" Mr. Khan's high opinion of himself does not suffice to create a genuine issue of material fact.  *Mills*, 83 F.3d at 843

Second, he cannot identify a comparator who was treated better.  A comparator must be shown to be "comparable in all material respects." *Raymond*, 442 F.3d at 610.  An employees who is among the "worst performing" is not comparable to those who are ranked as higher performing. *Id.* at 611.  In *Woods v. City of Berwyn*, 803 F.3d 865, 872 (7th Cir. 2015), the Seventh Circuit affirmed summary judgment where the plaintiff failed to propose the name of any employee who engaged in conduct comparable to the plaintiff and remained employed.

As shown above, Mr. Khan points to various co-workers and identifies random ways in which he suggests they might have had a different deal than he did.  But he has no idea why they had those deals and he never asked for their deals.  LR 56.1 ¶17.  He also does not know whether they were of American national origin.  *Id.*  Nor does he know whether any of them remained employed after being ejected by a client and failing a PIP.  *Id.*  Just pointing to co-workers without showing that they are similarly situated in all material respects will not do.  Mr. Khan cannot prove discrimination under the *McDonnell Douglas* framework.

Moreover, even if Mr. Khan could make out a prima facie case, there is no evidence whatsoever of pretext.  Mr. Khan can point to nothing to suggest that Mr. Belmont's and Ms. Elliott's independent negative assessment of his PIP performance and attitude were a sham invented as a cover for their secret bias against a fellow American.

**B.    There Is No Evidence Of A Disparate Impact On Mr. Khan.**

Mr. Khan's national origin claim is not saved by his theory that HCL favors those with "H1-Visa" status because he has no evidence that any such bias exists or has a disparate impact on Americans, or that he was injured by it.

The Complaint does not claim citizenship or visa status discrimination under Title VII or otherwise, but rather expressly and specifically claims "national origin discrimination in violation of Title VII." Dkt. 20:4:¶22. Title VII does not protect the attributes of citizenship or visa status but bias against those attributes can have a disparate impact on people of American national origin, which Title VII does cover. See *Espinoza*, 414 U.S. at 89, 94 (1973) ("Congress did not intend the term 'national origin' to embrace citizenship;" "nothing in the Act makes it illegal to discriminate on the basis of citizenship or alienage"); *Fortino v. Quasar Co., a Div. of Matsushita Elec. Corp. of Am.*, 950 F.2d 389, 392 (7th Cir.1991) (citizenship discrimination though not protected by Title VII could have a disparate impact on national origin since "citizenship and national origin are highly correlated"). Mr. Khan's theory is that a financial bias in favor of "'H1-Visa' status" disparately impacts those of American national origin and caused his termination. Dkt. 20:4: ¶20. But there is no evidence for this theory.

To prevail on a disparate impact theory Mr. Khan must show, among other things, that HCL has an "employment policy or practice," that it "disproportionately impacts members of a legally protected group" and that he "was personally injured by" it. See *Farrell v. Butler Univ.*, 421 F.3d 609, 616-17 (7th Cir. 2005). Mr. Khan has no evidence sufficient to raise a genuine fact question on any of these elements.

There is no evidence that HCL has a policy or practice favoring employees who are visa holders over Americans. The only testimony on this subject is that HCL has no such policy. LR 56.1 ¶21. Summary judgment is, therefore, appropriate. See *Gullett v. Town of Normal*, 156 Fed.Appx. 837, 842 (7th Cir. 2005) (affirming summary judgment because there "was no evidence that the Town had a policy of hiring full-time street workers only from the Waste Division");

13

*Grubbs v. Housing Authority of Joliet*, 1997 WL 281297, *25 (N.D. Ill. May 20) (awarding summary judgment for lack of evidence of "any bathtub policy at all").

Even if such a policy existed, there is no statistical evidence that employees who are of American national origin are disproportionally placed on PIPs or terminated. The plaintiff "bear[s] the burden of showing that a particular employment practice causes a disparate impact." *Allen v. City of Chi.*, 351 F.3d 306, 311 (7th Cir. 2003). To do so "the plaintiff must ... demonstrate causation by offering statistical evidence of a kind and degree sufficient to show that the practice in question has caused the [disparate impact] because of their membership in a protected group." *Farrell*, 421 F.3d at 616; see also *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 994–95 (1988) ("plaintiff must offer statistical evidence"); *Noreuil v. Peabody Coal*, 96 F.3d 254, 259 (7th Cir.1996) (disparate impact plaintiff must "put forth statistical evidence"); *Adams v. Lucent Technologies*, 284 Fed.Appx. 296, 304 (6th Cir.2008) ("complete failure to make any such statistical showing [of causation] is fatal to [the disparate impact] claim"); *Adams (Ind.)*, 742 F.3d at 735 (affirming summary judgment because "disparate impact" theory was "utterly devoid of evidentiary support").

Mr. Khan has no statistical evidence that employees of American national origin are disproportionately placed on PIPs or terminated. His counsel elicited Mr. Belmont's guess that thirty percent of HCL employees are on a visa, which he extrapolated from his own group. LR 56.1 ¶¶22. Whatever little that extrapolation may be worth as evidence of the composition of HCL's workforce, it reveals nothing at all about whether those of American national origin who do become employed by HCL are more or less likely than visa holders to be placed on a PIP or terminated. Mr. Khan has no statistical evidence on that question at all. Given that discovery is closed, it is too late to seek to develop such evidence. See *McQueen v. City of Chicago*, 2014 WL

1715439, *5 (N.D. Ill. April 30) (disparate impact plaintiff cannot "forestall summary judgment" to seek statistical evidence when he did not timely "move to compel" production of such evidence).

And, finally, even if Mr. Khan could clear those hurdles (which he cannot) he still would fail because there is no evidence that he, in particular, was placed on a PIP or terminated because of a general policy.  To have standing to bring a disparate impact claim the plaintiff "must trace a line from" the policy "to their particular injury."  *Jordan v. Evans*, 2020 WL 6624794, *6 (N.D. Ill. Nov. 11); see also *Carpenter v. Bd. of Regents of Univ. of Wis. Sys.*, 728 F.2d 911, 915 (7th Cir. 1984) (plaintiffs must show that they were injured by the policy alleged to have had a disparate impact); *Melendez v. Illinois Bell Telephone Co.*, 79 F.3d 661, 668 (7th Cir. 1996) (plaintiff alleging disparate impact must establish that he was qualified for the position sought for purposes of standing).  Mr. Khan can trace no line from a general HCL policy to his termination.

Mr. Khan's premise is not that he was caught up in the net of a company-wide policy but that Mr. Chapain personally set out to oust him (strangely because he is a fellow American) through a plot into which he recruited or duped his client, his peers, his supervisor, and a human resources manager.  LR 56.1 ¶¶20.   In other words, he was personally targeted by Mr. Chapain. This is incompatible with a disparate impact claim.  *Farrell* affirmed summary judgment on a disparate impact claim because the complaints were "specific to Dr. Farrell" as opposed to "women in general."  421 F.3d at 617; see also *City of Joliet v. New W., L.P.*, 825 F.3d 827, 830 (7th Cir. 2016) ("Disparate-impact analysis looks at the effects of policies, not one-off decisions, which are analyzed for disparate treatment.").  Summary judgment is appropriate here for the same reason.

## II.    There Is No Evidence Of Age Discrimination.

Mr. Khan's age discrimination claim fails because the only person he accuses of an ageist bias did not make or induce an adverse action.  The only person accused of ageist comments, Mr.

Chapain, had no decision-making authority. LR 56.1 ¶20. In the face of this daunting fact, he spins two evidence-free theories. One is a nonsensical conspiracy theory in which Mr. Belmont (late fifties) and Ms. Elliott (early sixties) agreed to Mr. Chapain's plot to oust him for being too old (late fifties). The other is that Mr. Chapain duped them into unwittingly terminating him, even though he did not start the wheels rolling, Ms. Bork did, and their subsequent decisions were based on their own direct interactions with Mr. Khan. Neither theory holds water.

### A. There Is No Evidence That A Decision-Maker Had An Ageist Bias.

Mr. Khan has no evidence that the HCL decision-makers, Mr. Belmont and Ms. Elliott, harbored an age bias. They are in their late fifties and early sixties. LR 56.1 ¶¶21-22. Mr. Khan admits that neither said anything at all about his comparable/lesser age. LR 56.1 ¶18. And Mr. Khan has no *McDonnell Douglas* framework evidence because, as shown above, he was not meeting HCL's legitimate expectations and cannot identify a comparator.

### B. Mr. Khan's Conspiracy Theory Is Pure Speculation.

The conspiracy theory fails because it is nothing but evidence-free speculation.

A plaintiff's mere assertion that people had an "'extremely close and personal relationship'" and "worked together" to discriminate against him is insufficient to "create the factual dispute needed to ward off summary judgment." See *Murray v. Chicago Transit Authority*, 252 F.3d 880, 888 (7th Cir. 2001) (plaintiffs' "subjective beliefs" do not "create genuine issues of material fact"); see also *Lugg v. Sutton*, 2021 WL 3673824, *19 (C.D. Ill. Aug. 18) (unsupported conspiracy theory that others who took action against plaintiff acted as a "'surrogate' or 'minion' for defendant do not defeat summary judgment). In *Tolson v. City of Chicago*, 2016 WL 1043326, *9 (N.D. Ill. March 16), the plaintiff failed to defeat summary judgment by offering the speculation that an "anonymous individual who" called in a tip, "the Budget Director at the time of Plaintiff's

16

termination, the Budget Director's immediate predecessor, and the Human Resources Department all coordinated their actions in a discriminatory conspiracy to remove Plaintiff." As a general rule the Seventh Circuit "'has typically been skeptical of such elaborate plot theories.'" *Murray*, 252 F.3d at 888 (quoting *Konowitz v. Schnadig*, 965 F.2d 230, 234 (7th Cir.1992)).

Mr. Khan's conspiracy theory is that Mr. Chapain recruited Mr. Belmont and Ms. Elliott as co-conspirators in an ageist plot concealed by a "stage show." LR 56.1 ¶20. His evidence starts and ends with his assertion that Mr. Chapain told him the PIP was a stage show without explanation why. LR 56.1 ¶9. Even if Mr. Chapain had called the PIP a stage show (which he disputes) *and* given age as the real reason (which he undisputedly did not), there is no evidence that Mr. Belmont or Ms. Elliott considered the PIP a stage show or joined an ageist conspiracy. This would be surprising given their comparable and even older ages. LR 56.1 ¶¶22-22.

In sum, the conspiracy theory is entirely devoid of evidentiary support.

### C.      Mr. Khan's "Cat's Paw" Fable Has Neither Monkey Nor Cat.

The alternative theory that Mr. Chapain duped his unwitting superiors into terminating Mr. Khan fails because: (a) there is no evidence he duped anyone; and (b) the uncontroverted evidence shows that the decision-makers exercised their own independent judgment.

"In the employment discrimination context, the cat's paw theory of liability applies when 'a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" *Woods*, 803 F.3d at 869 (citations omitted). The colorful name comes from "one of Aesop's Fables in which a monkey induces a cat, by flattery, to extract roasting chestnuts from the fire," snatches the chestnuts and leaves the cat with nothing but scalded paws for the effort. *Id.* The "chain of causation" upon which the theory depends breaks down when the decision-maker makes an independent

"determination apart from the biased subordinate's recommendation." *Id.* at 770. Where this occurs there is no liability even though the biased subordinate "set the wheels in motion." *Id.*

The first problem with a cat's paw theory here is that there is no evidence that Mr. Chapain duped anyone or set any wheels in motion. Baxter's Ms. Bork set the wheels in motion. LR 56.1 ¶¶7, 11. Mr. Khan can produce no evidence that Mr. Chapain conspired with or duped Ms. Bork or her colleagues at Baxter into setting wheels in motion.[3] Mr. Khan admits that he worked directly and in-person with Ms. Bork and her Baxter colleagues.[4] LR 56.1 ¶¶4-7. Ms. Bork's email directing Mr. Belmont to remove Mr. Khan from her team speaks of her own assessment of his incompetence and does not even hint at any reliance on Mr. Chapain. LR 56.1 ¶11. There is no evidence that Mr. Chapain lies behind Mr. Khan's ejection from Baxter's project.

Nor is there evidence that, during the ensuing PIP process, Mr. Chapain duped Mr. Belmont or Ms. Elliott into terminating Mr. Khan unwittingly. To the contrary, they made their own independent judgments based on their personal interactions with Mr. Khan. LR 56.1 ¶¶12-14.

Mr. Belmont did not make the decision to terminate Mr. Khan but personally participated in the administration of his PIP and found his performance deficient and his attitude insubordinate. LR 56.1 ¶¶12-14. He independently assessed that Mr. Khan was unable or unwilling to perform

_____

[3] Mr. Khan is not helped by his speculation that Ms. Bork may have joined Mr. Chapain in a conspiracy. LR 56.1 ¶¶22-22. His best effort to tie her into a conspiracy is the hearsay ("according to the people who was talking") that she and Mr. Chapain were "friends outside of work." *Id.* Even if mere friendship was enough to create a fact question on conspiracy – which, as Murray holds, it is not – Mr. Khan's attempt to show even friendship is inadmissible hearsay. *Gunville v. Walker*, 583 F.3d 979 (7th Cir. 2009) ("may not rely upon inadmissible hearsay to oppose a motion for summary judgment").

[4] Toward the end of Mr. Khan's deposition, after already having testified at length to all of the specific ways in which he worked face-to-face with Baxter employees, he equivocated about whether and precisely how he worked directly with them. Khan 228:17-229:13. However, Mr. Khan cannot create a genuine issue of fact by contradicting himself. See *Soyinka v. Franklin Collection Services*, 2022 WL 900161 (N.D. Ill. March 27) (the "sham" doctrine is "not limited to affidavits and depositions—the principle instructs generally that 'a party cannot create a genuine issue of material fact by contradicting prior sworn testimony,'" citations omitted).

the PIP.  *Id.*  He had the expertise to determine Mr. Khan's PIP performance for himself and he independently concluded that it was deficient.  LR 56.1 ¶14.  In addition to incompetence, Mr. Belmont personally observed Mr. Khan's argumentativeness, yelling and insubordination.  *Id.* There is no evidence Mr. Chapain duped him into his negative assessment of Mr. Khan.

Ms. Elliott is the decision-maker who determined to discontinue the PIP and place Mr. Khan on the "bench" where, unless a new assignment was found, he would be terminated effective April 3, 2020.  LR 56.1 ¶¶14-15.  In addition to having the benefit of Mr. Belmont's independent judgment, she independently determined that "from my point of view, it seemed as though he was not accepting the – his responsibility of his performance."  LR 56.1 ¶14.  Moreover, she personally observed Mr. Khan's bad attitude and argumentativeness which is what led her to discontinue the PIP and place Mr. Khan in a status subject to termination.  *Id.*  There is no evidence that Mr. Chapain duped her into her decision.

In sum, there is no evidence that Mr. Chapain set any wheels in motion or otherwise duped the HCL decision-makers.  Mr. Khan has neither a monkey nor a cat for his fable.

### CONCLUSION

For the foregoing reasons, the Court should award summary judgment in favor of HCL and against Mr. Khan.

May 22, 2023                                Respectfully submitted,

                                            HCL AMERICA INC.


                                            By:  s/ *Thomas A. Lidbury*
                                                    One of its attorneys

19

Thomas A. Lidbury
Ebony C. Smith
Hilarie M. Carhill
OGLETREE, DEAKINS, NASH, SMOAK
 & STEWART, P.C.
155 N. Wacker Drive, Suite 4300
Chicago, IL 60606
P 312.558.1220
F 312.807.3619

tom.lidbury@ogletree.com/312-558-1230
ebony.smith@ogletree.com/312-558-1252
hilarie.carhill@ogletree.com/312-558-1242

56545675.v1-OGLETREE