UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AFTAB A. KHAN,

        Plaintiff,

v.

HCL AMERICA, INC.,

        Defendant.

No. 21-cv-4827

Honorable Judge Maldonado

## PLAINTIFF'S RESPONSE TO DEFENDANT'S LOCAL RULE 56 FACTS

A.

MR. KHAN & THE
LABELING GROUP

1.     Plaintiff, Aftab Khan, was employed by HCL and embedded on premises within HCL's client, Baxter International, Inc. ("Baxter"), on various projects from 2015 through April 3, 2020. Khan Deposition (Ex. A) 39:10-17. In about June or July 2019 Mr. Khan was assigned to the Labeling Group where his new supervisors were Michael Belmont and Prakash Chapain. Belmont Deposition (Ex. B) 17:23-18:18; Khan 46:9-47:7. This was the result of a reorganization by which the group that Mr. Khan had been assigned to was merged into Mr. Belmont's group. Belmont 18:12-18. The Labeling Group was tasked with redlining drug labels, *i.e.*, proposing revisions to bring Baxter's labels into compliance with new EU regulations that were coming into effect. Belmont 14:13-15:5; 25:7-19; Khan 50:3-52:10.

**RESPONSE**: Agreed.

B.

MR. KHAN'S SUPERVISORS

2.      Mr. Belmont is a Regional Director for HCL.  Belmont 9:15; 18:7-8.  Mr. Belmont oversees a large, long term program for HCL's client, Baxter.  Belmont 9:23-12:4.  The program includes approximately forty HCL employees physically embedded within Baxter performing work in nine different work streams.  Belmont 9:23-12:4.  One of those work streams is the Labeling Group, comprised of approximately seven HCL employees.  Belmont 13:15-19; 15:6-9.  As the ultimate manager of the Labeling Group, Mr. Belmont understood the work and could independently evaluate the performance of the team.  Belmont 34:13-35:6.  However, Mr. Belmont generally did not observe the work of the Labeling Group on a daily basis but rather relied on Mr. Chapain to update him on the Labeling Group's performance.  Belmont 24:11-19.

**RESPONSE**: Agreed.

3.      From 2019 through 2022, Mr. Chapain was the Project Manager overseeing the Labeling Group.  Belmont 13:4-19; 15:6-9.  As the Project Manager, Mr. Chapain distributed work and managed the team toward the end goals.  Chapain Deposition (Ex. C) 33:24-34:10; Khan 67:9-68:21.  He did not directly redline labels or daily review the team's work.  Chapain 33:24-34:10; Khan 67:9-68:21, 78:3-13, 96:5-97:15.  However, he was well versed in Baxter's established processes for redlining.  Chapain 44:14-23.

**RESPONSE**: Agreed.

## C.
### MR. KHAN'S WORKING RELATIONSHIPS WITH BAXTER

4.      The HCL redliners, including Mr. Khan, worked on site and interacted directly with their Baxter counterparts, often presenting their work product to them in in-person meetings.  Khan 56:15-60:12.  Mr. Chapain was rarely in attendance at those meetings given that he was not responsible for the substance of the specific redlining being discussed.  Khan 67:9-24 ("less than

20 percent;" "mostly he was not in those meetings;" "He was not doing, he does not want to know what's going on, that's between us and the labeling team what we finalize"); Chapain 41:7-42:11 (attended "a few" working meetings).

**RESPONSE**: Agreed.

5.     When Mr. Khan initially joined the relining team Baxter's labeling subject matter expert ("SME") was Michael Chellson. Khan 50:22-53:5. Mr. Chellson provided Mr. Khan with substantial one-on-one attention and guidance on his redlining assignments. Khan 53:6-55:9. Mr. Khan felt that Mr. Chellson was very capable and they got on well. Khan 62:9-63:3.

**RESPONSE**: Agreed.

6.     In January 2020, Baxter terminated Mr. Chellson. Blemont 64:2465:3; 72:9-73:14. Baxter's Cheryl Bork, who had been above Mr. Chellson, took over his daily management of the HCL redlining team. Khan 55:10-57:14. Mr. Khan did not believe Ms. Bork was capable of providing him the substantive guidance he needed on his assignments. Khan 55:10-57:14; 62:9-63:10. While Mr. Khan describes his working relationship with Mr. Chellson as "very good," he describes his working relationship with Ms. Bork as "professional." Khan 63:1-10. Mr. Khan denies any knowledge that Ms. Bork was dissatisfied with his work. Khan 63:1-64:3.

**RESPONSE**: Agreed.

7.     Ms. Bork was, in fact, unsatisfied with Mr. Khan's work. Chapain 37:18-40:5. Beginning in late 2019, Ms. Bork informed Messrs. Chapain and Belmont that Mr. Khan's work performance was an issue. Belmont 24:20-25:4; Chapain 39:8-40:5. On one notable occasion in or around February 2020 Mr. Khan was slated to run a meeting with the Baxter team but he did not show up. Chapain 42:22-43:8. On another occasion Mr. Khan was supposed to present to the Baxter stakeholders and was unable to effectively do so. Chapain 43:9-24. Mr. Khan admits that

the Baxter employees overseeing the redlining team sent back "everything" to "retouch" and "rework" due to "technical error[s]," so much so that Mr. Khan proposed to Mr. Chapain the adoption of a new "buddy system" in which his work would be more thoroughly reviewed and fixed by peers before being exposed to scrutiny at Baxter. Khan 110:15-112:11. Mr. Khan admits to refusing to redline labels as he was directed per Baxter's established process because he believed he knew better than Baxter. Khan 100:1-9 ("And I would say no, I will not follow this template because this template is not aligned according to the regulation"). Ms. Bork spoke with Messrs. Belmont and Chapain multiple times about her escalating dissatisfaction with Mr. Khan's work. Belmont 30:18-31:11, 37:24-38:15; Chapain 38:5-40:5.

> **RESPONSE**: Agreed, with further clarification that Bork at no time expressed any dissatisfaction to Plaintiff and that Chapain had absolutely no recollection, nor could provide any description of, the alleged dissatisfaction. (Ex A, Pl. Dep., pg. 63:11-17; Ex. B, Chapain Dep., pgs. 38:9-40:10)

D.

MR. KHAN'S PIP

8.      On or about March 9, 2020, Mr. Khan was placed on a Performance Improvement Plan ("PIP") due to Ms. Bork's expressed dissatisfaction and Mr. Belmont's consultation with Lynne Elliott, an HCL Human Resources Manager. Chapain 57:7-19 & Ex. 14; Elliott Deposition (Ex. D) 36:15-41:7. HCL utilizes PIPs when employees like Mr. Khan are struggling in an effort to rehabilitate and retain them. Elliott 32:18-33:18 ("We see the PIP process as a carrot and not a stick;" purpose is to "encourage and build up" and either to "put in another position or to just stay with the client as long as they can"). Messrs. Belmont and Chapain met with Mr. Khan on March 10, 2020 to review their expectations for the PIP. Khan 181:2-12. Mr. Belmont believed that Mr. Khan initially accepted the PIP with a positive attitude. Belmont 33:2-6. Mr. Chapain did not wish to be but he was tasked with administering Mr. Khan's PIP. Chapain 57:20-22; Khan 157:4-8, 183:13-21, 188:10-18.

**RESPONSE**: Agreed.

9.      On March 12, 2020, Mr. Khan emailed Mr. Belmont to allege that on March 11, 2020 Mr. Chapain told him to "consider himself out from HCL-Baxter" and that the PIP is "just a stage show." Belmont 59:23-60:17 & Ex. 18.    Ms. Elliott's contemporaneous notes reflect that Mr. Chapain denied making the alleged remarks. Elliott 92:14-94:14 & Ex. 37 ("didn't say stage show – Prakash didn't make this comment"). Mr. Chapain no longer recalls the conversation at all but believes he said no such thing. Chapain 62:24-64:7. Nor did he believe the PIP was a stage show.    Chapain 76:12-14.    Neither Mr. Khan's contemporaneous email nor his deposition testimony about the conversation include any suggestion that age or national origin were mentioned. Khan 113:1-6 (""I don't know what was causing or what the reason"), 113:7 ("I have no reason what was contribution"), 156:22-157:18, 183:13-184:3, 185:20-188:6 ("entire conversation" was "it's a stage show" and "I kind of walk away from him") .

> **RESPONSE**: Agreed with clarification that Chapain twice failed to deny having made the statements that the performance review plan was "a stage show." (Ex. B, Chapain Dep., pgs. 63:3-64:7). Plaintiff further states that at his deposition, he testified to the age-related statements and other discriminatory statements made to him by Chapain. (Ex. A, Pl. Dep., pgs. 107:17-109:5; 218:1-21).

10.      In reaction to Mr. Khan's accusatory email, Mr. Belmont directed Mr. Chapain to "straighten this out" with Mr. Khan. Belmont 61:8. And on March 12 or 13, 2020, Ms. Elliott had discussions with Mr. Chapain and with Mr. Khan. Elliott 55:9-56:20 & Ex. 37; Khan 195:15-197:14. Ms. Elliott assured Mr. Khan orally and in writing that his PIP would be conducted "fairly and properly" and "based on performance." *Id.*, & Elliott Declaration (Ex. F), ¶4 & Ex. 1.

**RESPONSE**: Agreed.

E.

BAXTER'S DECISION
TO REMOVE MR. KHAN

11.     Also on March 12, 2020, Ms. Bork followed up the "numerous discussions" that began in "Q4 2019" with a formal written email directing that Mr. Khan be "removed immediately" because he is "incapable of doing his work by himself" and "without multiple issues and errors." Belmont Ex. 18.  Ms. Bork, as the client representative overseeing the Labeling Group, had the power to remove any HCL employee she wished from her project.  Belmont 31:7-9; Elliott 30:24-31:5.

**RESPONSE**: Agreed.

F.

CONTINUATION AND
TERMINATION OF THE PIP

12.     While Ms. Bork could and did remove Mr. Khan from her project with Baxter, he remained an HCL employee.  Belmont 31:10-11; Elliott 31:6-8.  That left Mr. Khan both ineligible for a PIP, for lack of an active client assignment, and ineligible for reassignment to another client project, for lack of completion of the PIP.  Elliott 40:19-41:7; 41:21-24; 49:10-50:16.  Ms. Elliott made an exception to allow him to continue with the PIP in an administrative role, *i.e.*, on HCL's dime.  Elliott 40:19-41:7; 49:10-50:16; 51:17-21.

> **RESPONSE**: Agreed with clarification that Defendant fired Plaintiff prior to the 4-week duration of the performance improvement plan. (Ex. D, Elliott Dep., pgs. 25:13-16, 28:10-22).

13.     Mr. Khan' first PIP deliverable was late and incorrect.  Chapain 68:9-69:3; 75:15-76:4 & Ex. 14.  Mr. Khan resisted performing the second PIP assignment.  Chapain 69:14-18. There were multiple email exchanges on or around March 18, 2020 between Mr. Khan and Mr. Chapain in which Mr. Khan exhibited an inability to understand the assignment.  Chapain 76:5-11; Khan 189:5-193:24, 207:9-212:8.  Mr. Khan attributes his inability to understand the assignment to the purported incompetence of Mr. Chapain.  Khan 204:8-205:13.  A meeting was

then scheduled with Messrs. Khan, Belmont and Chapain attending in person and Ms. Elliott participating by phone. Chapain 69:14-72:3; Belmont 32:7-33:17; 69:12-70:15.

> **RESPONSE**: Agreed with further clarification that Plaintiff made repeated attempts to meet with Chapain to discuss the assignments made in the performance review plan but Chapain did not do so, instead telling Plaintiff that the process was just "a stage show." (Ex. A, Pl. Dep., pgs. 156:14-157:3, 195:15-197:14).

14.     At that meeting, on or about March 23, 2020, Mr. Belmont personally observed Mr. Khan behaving inappropriately, including argumentativeness, yelling and insubordination. Belmont 32:7-33:17; 69:12-70:15. Mr. Belmont observed Mr. Khan obdurately refusing to follow the established process for redlining drug labels that everyone else follows without deviation and being unable to complete a simple task in a reasonable time. Belmont 33:18-35:9 ("he doesn't want to follow that process" that "everyone else in the group follows" because "he has a different way"). Mr. Belmont had the expertise to determine Mr. Khan's PIP performance for himself and he did independently conclude that it was deficient. Belmont 34:13-35:6. Mr. Belmont and Ms. Elliott both personally observed Mr. Khan's argumentativeness, yelling and insubordination. Belmont 32:16-34:12 ("very argumentative") ("to a point where it got way out of control with him being insubordinate to myself") ("continued to argue back" to "a point where the call had to be – or the meeting had to be ended"); Elliott 52:21-54:1 ("This would be from sitting on a PIP review with Mr. Khan" where "he would get very upset and argumentative") ("from my point of view, it seemed as though he was not accepting the – his responsibility of his performance"), 84:10-85:4 ("Mr. Khan got combative"), 88:9-91:22 ("no change in his attitude" so "therefore, I said … we're going to stop this now"). Mr. Khan's behavior was so inappropriate and unconstructive that Ms. Elliott ended the PIP meeting and took the decision to abandon the PIP midstream. Belmont 69:12-70:15; Chapain 70:13-71:2; Elliott 43:12-21; 53:13-21.

**RESPONSE:** Agreed except for the characterizations of Plaintiff's demeanor as "inappropriate and unconstructive" given that Chapain had specifically told Plaintiff that the process was just "a stage show." (Ex. A, Pl. Dep., pg. 156:22-157:3).

G.

INTERNAL SEARCH FOR
ASSIGNMENT & TERMINATION

15.     Despite Mr. Khan's failure of the PIP process, and thus ineligibility for another assignment within HCL, Ms. Elliott determined to post Mr. Khan in an internal system as Advanced Available For Deployment ("AAFD"), sometimes called the "bench," showing him to all HCL managers as eligible for another assignment within HCL. Elliott 60:11-14; Khan 140:11-141:2. Being in AAFD status meant that Mr. Khan's employment would be slated to end in two weeks (April 3, 2020) unless another assignment could be found for him. Elliott 52:14-52:15; Khan 140:11-141:2. During the "bench" period, in addition to being posted internally as available for other assignments, the Workforce Planning Committee actively sought another assignment for Mr. Khan, Mr. Khan himself could and did reach out to HCL and Baxter contacts to try to find an assignment and Mr. Belmont also reached out to colleagues in an effort to find another assignment within HCL for Mr. Kahn. Belmont 55:22-56:16; Khan 140:11-141:2, 144:7-146:11; Elliott 41:5-42:17, 49:16-19. No assignment was found for him and therefore his employment terminated effective April 3, 2020. Khan 100:17-21.

**RESPONSE:** Agreed with further clarification that Indian coworkers were transferred and reassigned to new positions "seamlessly." (Ex. A, Pl. Dep., pgs. 219:21-22:7).

16.     Because Mr. Khan's abrupt ejection from the team his pending assignments were redistributed to the redlining team and offshore resources. Belmont 48:17-49:12. About six weeks later Mr. Belmont made the decision to transfer Aaron Baynard onto the redlining team to fill the opening left by Mr. Khan's termination. Khan 48:17-50:11. Mr. Baynard was an American

approaching or in his fifties. Chapain 49:4-6; Defendant's Objections and Answers to Plaintiff's

First Set of Interrogatories (LR 56.1 Ex. E), No. 8.

> **RESPONSE**: Agreed with further statement that Defendant terminated Baynard-
> "approaching or in his fifties" soon after. (Ex. M, Defendants supplemental interrogatory
> answers, pg. 2).

## H.
### POST-TERMINATION
### DISCRIMINATION CLAIMS

17.    After Mr. Khan's termination, for the first time, Mr. Khan claimed that he was

discriminated against on the basis of his age and national origin. Mr. Khan was born in 1964, is

ethnically Indian, hails from Pakistan and is now a U.S. citizen. Dkt. 20 ¶5; Chapain Declaration

(Ex. E), ¶¶2-3; Khan 7:11-12, 215:12-14. Mr. Khan can identify no comparator – of any age,

national origin or visa status -- who, like him, was thrown off of a team by a client for

incompetence, failed a PIP, and yet remained employed. Khan 64:4-11, 151:5-19. He identifies

co-workers who he claims were treated better -- allowed to work remotely, different hours, or with

multiple teams – but he does not know their age or national origin, he has "no idea" why they were

allowed those things, and he never even wanted or asked to do any of those things himself. Khan

89:24-90:3, 146:22-149:7, 160:4-161:15.

> **RESPONSE**: Agreed, but disputed that Plaintiff "failed a PIP." In fact he was terminated
> prior to the completion of the "PIP." (Ex. B, Chapain Dep., pgs. 59:20-61:5). Further
> disputed as highly misleading and intending to create the false inference that the young,
> H1 Visa coworkers, whom Chapain testified that he preferred, were not in fact young and
> of Indian national origin based upon a citation to Plaintiff's testimony that he did not
> know their ages. Chapain testified and the record contains proof that the comparators
> were younger employees working on H1 Visas. (See Facts 21-24 below). In addition,
> Michael Belmont testified that approximately 30% of Defendant's employees were on H1
> Visas. (Exhibit C, Belmont, pgs. 23:6-24:1).

18.    Prior to his termination, though lightning quick to raise other allegations such as

his "stage show" allegations, Mr. Khan never asserted to anyone that Mr. Chapain had made

derogatory age-related comments. Khan 108:4-109:5 ("I did not brought it up"); Elliott 79:12-

80:14 (Khan did not raise discrimination claims, "never happened"). He now claims that such

comments started in November or December 2019, when Mr. Chapain suddenly began singling

him out in team meetings with derogatory age-related comments. Khan 212:22-24. Even now

Mr. Khan admits that neither Mr. Belmont nor Ms. Bork said anything at all about his age. Khan

88:8-17, 91:10-15, 179:21-23.

> **RESPONSE:** Agreed, but argumentative and immaterial. Plaintiff clearly testified to a
> series of age-related statements made to him by Chapain. (Ex. A, Pl. Dep., pgs. 107:17-
> 108:22, 217:9-218:21).

19.     As to national origin and visa status, Mr. Khan even now admits that no one ever

said a word about that, including Mr. Chapain, Mr. Belmont, Ms. Elliott and Ms. Bork. Khan

88:8-17, 91:10-15, 179:24-180:5, 215:12-216:7.

> **RESPONSE**: Disputed. Chapain told Plaintiff that the company "could get rid of you and
> hire two college graduates making less money than you"(Ex. A, Pl. Dep., pg. 218:8-21).
> This in a company with 30% of its workforce holding H1 Visas. (Exhibit C, Belmont
> Dep., pgs. 23:6-24:1).

20.     Though Mr. Chapain did not and could not remove Mr. Khan from the Labeling

Group or fire him from HCL (Chapain 33:17-19, 40:15-18), Mr. Khan offers no evidence

whatsoever of any bias on the part of anyone but Mr. Chapain. In lieu of such evidence Mr. Khan

speculates that Mr. Chapain drew his peers and Ms. Bork into a conspiracy to get him terminated

because of his age and national origin. Khan 172:5-174:3 (Kunal Patel is "part of the stage show,"

"in on the fix," and "out to get [me]"), 223:1-5 ("Maybe she's [Ms. Bork] part of the stage show").

He admits to having no basis for this speculation. *Id.* All he can offer is the hearsay ("according

to the people who was talking") that Mr. Chapain and Ms. Bork were "friends outside of work."

Khan 223:16-224:4. Mr. Khan compounds this speculation with the further extrapolation that it is

"possible" that Mr. Chapain also recruited Mr. Belmont and Ms. Elliott into the "conspiracy to get rid of old and American people." Khan 231:7-11.

> **RESPONSE:** Disputed. Chapain testified that it was his "obligation" to relay negative comments about Plaintiff to his supervisor. (Ex. B, Chapain Dep., pg. 40:11-21).

## I.
## MS. ELLIOTT

21.     Ms. Elliott is a native born U.S. citizen who is in her sixties. Elliott 6:8-13; Elliott Decl. ¶1. HCL has no policy preference for hiring visa holders and Ms. Elliott generally does not know employees' visa status. Elliott 79:3-11. Prior to his post-termination claims, Ms. Elliott did not know Mr. Khan's national origin, visa status or age. Elliott Decl. ¶3. Based on Mr. Khan's name, she assumed he was of Indian national origin. Elliott Decl. ¶3. Mr. Khan did not tell Ms. Elliott that Mr. Chapain had made derogatory comments about his age or visa status. Elliott 79:12-80:14.

> **RESPONSE**: Agreed.

## J.
## MR. BELMONT

22.     Mr. Belmont is a native born U.S. citizen in his late fifties. Belmont Declaration (Ex. G) ¶1. Mr. Belmont did not know or suspect that Mr. Khan was of American national origin. Belmont Decl. ¶2. He also does not know whether Mr. Khan is a U.S. citizen. Belmont 26:7-8. He often does not know the citizenship, visa status or national origin of those he supervises. Belmont 18:24-24:1. He happens to know eleven subordinates are on visas and estimates that thirty percent probably are on visas. Belmont 23:6-24:1. He does not know the reason this number of visa holders work for HCL. Belmont 24:2-4. He does not know if visa holders are paid less than other qualified candidates or if that is a reason they are hired. Belmont 28:17-29:6. To the

extent he is involved in hiring decisions he is interested in candidates' experience and not how much money they make. Belmont 28:17-24. Before Mr. Khan's termination and subsequent allegations, he was never aware that Mr. Chapain actually or allegedly made age-related remarks to Mr. Khan. Belmont 61:15-62:21.

**RESPONSE**: Agreed.

K.

MR. CHAPAIN

23.     Mr. Chapain hails from Nepal, has never held an H1 visa, became a U.S. citizen in 2018, and is forty years of age. Chapain 13:17-14:8. Based on his language and culture, Mr. Chapain assumed that Mr. Khan was of Indian national origin. Chapain Decl. ¶¶2-3. Mr. Chapain denies making any of the age-related comments that Mr. Khan belatedly asserts he made. Chapain 64:8-18. He does not know whether Mr. Khan is a U.S. citizen or visa holder. Chapain 25:6-9. He denies telling Mr. Khan that visa holders are generally younger or less expensive. Chapain 64:19-22. He does not know if visa holders generally are younger or make less money. Chapain 64:64:23-65:6. Nor did he know how much HCL paid Mr. Khan or anyone else on the redlining team. Chapain 65:8-11..

> **RESPONSE**: Agreed, with clarification that Defendant is merely alleging herein that Chapain "denies telling Mr. Khan that visa holders are generally younger or less expensive." That is clearly a disputed fact in this case.

## PLAINTIFF'S LOCAL RULE 56 STATEMENT OF ADDITIONAL MATERIAL FACTS THAT MILITATE AGAINST SUMMARY JUDGMENT

1. Plaintiff began employment with Defendant in February, 2015 after years of prior experience with companies including Abbott Laboratories. His date of birth is

September 28, 1964. (Ex. A, Pl. Dep., pgs. 17:24-19-2, 39:10-12; Ex. E- Plaintiff background history).

2. Plaintiff's educational background includes a four-year college degree in Pakistan followed by a three-year Associates Degree in Health Care from College of DuPage. (Ex. A, Pl. Dep. Pgs. 8:2-10:11).

3. In November, 2017, Plaintiff was promoted to the position of "UDI Specialist." (Ex. A, Pl. Dep., pgs. 42:-43:16).

4. Defendant regarded Plaintiff as "exceeding expectations" throughout his career with Defendant until slightly prior to his termination. (Ex. A, Khan Dep, Pg. 222; Ex. F, 2019 performance review; Ex. G, 2018 performance review.

5. Plaintiff's supervisor Chapain would mock Plaintiff about his age, asking questions such as "How old are you?", "What year did you graduate from college?", and "When are you planning to retire?" Referring to another younger employee, Chapain noted that the younger employee was not even born when Plaintiff graduated from college. (Ex. A, Pl. Dep., pgs. 107:17-108:22).

6. At another point, Chapain told Plaintiff that "You've been here a long time. The company can get rid of you and hire two college grads making less money than you." (Ex. A, Pl. Dep., pg. 218:8-21).

7. The performance improvement plan that Plaintiff was placed on states on its face that it would have a four-week duration. When placed on the plan, Chapain told Plaintiff that the plan was "just a stage show." (Ex. A, Pl. Dep., 157:1-3; Ex. H, Performance Review Plan).

8. HR representative Lynne Elliott testified that performance improvement plans at Defendant are normally 30, 60, or 90 days, and that they all start out with at least a 30-day duration. (Ex. D, Elliott Dep., pg. 25: 6-16).

9. Chapain twice did not deny at his deposition that he told Plaintiff that the plan was just a "stage show." (Ex. B, Chapain Dep., pgs. 62:24-64:5).

10. Plaintiff complained to Chapain and to Michael Belmont about the lack of clarity as to the tasks assigned in the performance improvement plan. (Ex. A, Pl. Dep., pgs 199:6-200:13; 204:14-205:18). Plaintiff complained about a lack of communication concerning the objectives of the plan. (Ex. A, Pl. Dep, pgs. 191:1-192:16).

11. Plaintiff also reported Chapain's comments and the lack of communication to HR representative Lynn Elliott and to Michael Belmont. (Ex. A, Pl. Dep., pgs. 195:15-197:14; Exhibit D, Elliott Dep., pgs. 46:24-48:17, 55:6-56:9); Ex. I, Ex. J.

12. In Plaintiff's observations, younger employees who were on "H1" visas were transferred from one position to another "seamlessly." (Ex. A, Pl. Dep., pgs. 219:13-222:4).

13. Cheryl Bork at no time expressed any dissatisfaction to Plaintiff. (Ex. A, Pl. Dep., pg. 63:11-17).

14. Chapain did not recall any detail about any complaints allegedly made to him about Khan by a customer Cheryl Bork. (Ex. B, Chapain Dep., pgs. 38:9-40:10).

15. Although Chapain denies any involvement in the decision to fire Khan, he testified that he had "the moral obligation to highlight any complaints to my manager." (Ex. B, Chapain Dep., pg. 40:11-18).

16. The most previous performance review for Khan prior to his firing was never completed. Chapain testified that he has no idea why. (Ex. B, Chapain Dep., pgs. 50-54); Ex. K, 2020 performance review).

17. The performance improvement plan was supposed to last for four weeks. Chapain testified that Khan was not cooperating with the plan. (Ex. B, Chapain Dep., pgs. 59:20-61:11).

18. HR representative Lynne Elliott agreed that a performance plan was to last for 30 days and that Plaintiff was fired sooner than that. (Ex. D, Elliott Dep., pgs. 25:6-16, 28:3-22).

19. Chapain did not deny that Khan kept attempting to meet with him during the performance plan. He testified that he could not recall why he was disappointed with Khan's performance on the first improvement plan assignment. (Ex. B., Chapain Dep., pgs. 57:17-62:23; 67:22-69:20).

20. Another employee, Chitti Babu, was permitted to transfer jobs "multiple times", including away from the Labeling team on which Plaintiff also worked. (Ex. A, Pl. Dep. pgs. 152:5-155:16).

21. Chapain could not think of any occasion in which an employee working on an H1 visa was ever fired. (Ex. B., Chapain Dep., pg. 75:1-8).

22. A Mr. Punhir, whom Chapain thinks is in his 30s, took over parts of Khan's job after his firing. (Ex. B., Chapain Dep., pg. 49:1-3); Ex. L, Defendant Interrogatory answers, page 1).

23. A co-worker of Plaintiff, Aayushi Kasiwal, is in her late 20s, held an H1 visa, and was of Indian national origin. (Ex. B., Chapain Dep., pgs. 14:16-16:2). According to

Chapain's supervisor Michael Belmont, she took over Khan's job after he was fired. (Ex. C., Belmont Dep., pg. 45:19-24).

24. Another co-worker of Plaintiff, Shradda Parmar, was about 30 years of age and of Indian national origin. (Ex. B, Chapain Dep., pgs. 16:13-17:13).

25. Three other co-workers of Plaintiff were Vinoth Kumar, in his 30s and of Indian national origin; Krutal Patel, in his 20s and of Indian national origin; and Mohammed Ahmed, in his 30s and of Indian national origin. (Ex. B., Chapain Dep., pgs. 17:14-18-21; 54:21-55:13).

26. According to Chapain's supervisor Michael Belmont, Defendant employed approximately 11 employees with H1 visas, or about 30% of its workforce. He testified that he had no idea why Defendant employed so many employees who were on H1 visas. (Ex. C., Belmont Dep., pgs. 23:6-24:4).

27. Plaintiff was frequently tasked with answering questions from younger, less experienced employees and helping them adjust to American culture. (Ex. A, Pl. Dep., pgs. 126:24-128:16, 133:12-134:21).

28. Belmont testified that performance improvement plans were in fact to have a duration of four weeks; that there was to be a weekly "check-in" between the employee and the supervisor; and that Plaintiff was fired before the four weeks had expired. (Ex. C, Belmont Dep., pg. 59:1-22).

29. An Indian co-worker, Manikandan Subramanian, was placed on a performance review plan for poor performance but was not fired. Another coworker over the age of 40, Aaron Baynard, was fired. (Ex. M), Defendant's Supplemental Interrogatory Answers, pg. 2).

30. Lynne Elliott was the HR representative involved in the firing of Plaintiff. She testified that she does not have access to, nor reviews, personnel files prior to a termination and that, in this case, she just took Michael Belmont's "word for it" concerning Plaintiff's performance. (Ex. D., Elliott Dep. Pgs. 18:14-20:23). In order to view a personnel file, she would need to contact someone in Defendant's office in India. Id., pgs. 16:17-17:20).

31. Elliott testified "Did I go directly to the team and ask them to pull his record for the last four years? No, I did not." (Ex. D, Elliott Dep., Pg. 20, 10-23).

32. Elliott has no educational background in the employment field and has received "maybe one or two trainings" while employed with Defendant. (Ex. D, Elliott Dep., pgs. 6:5-11, 9:13-10:4).

33. Elliott testified that she would advise against discussing an employee's age with the employee, but that it was fine in her view to question the employee about how long ago they attended school. (Ex. D., Elliott Dep., pgs 78:10-79:2).

34. Elliott testified that she does not know if Plaintiff's most recent performance evaluation had ever been completed. (Ex. D, Elliott Dep., pgs 70:17-72:22).

35. Elliott acknowledged that Plaintiff reported to her that Chapain told him "Consider yourself out from HCL Baxter International. You are not going to make it. Performance Improvement Plan, PIP, is just a stage show." (Ex. D.., Elliott Dep, Pg. 47, 20-24).

36. Elliott acknowledged that Plaintiff complained to her that he could not get Chapain to meet with him during the PIP. (Ex. D., Elliott Dep., Pg. 58, 17-23).

37. Elliott testified that HR representatives have no way of knowing whether hiring or firing decisions are discriminatory. HR simply "trusts that they know." (Ex. D., Elliott Dep., Pgs. 77, 21-24, Pg. 78, 1-2).

Respectfully submitted,

By: /s/Richard J. Gonzalez

Richard J. Gonzalez
Law Offices of Chicago-Kent College of Law
565 West Adams Street, Suite 600
Chicago, IL 60661
(312) 906-5079
rgonzale@kentlaw.edu

## CERTIFICATE OF SERVICE

To:     Thomas A. Lidbury & Ebony C. Smith
        Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
        155 North Wacker Drive, Suite 4300
        Chicago, IL 60606
        (312) 558-1220
        Thomas.lidbury@ogletreedeakins.com
        Ebony.smith@ogletreedeakins.com

        I certify that I served a copy of the foregoing document on all counsel of record via the

Court's CM/ECF system on June 13, 2023.

                                        /s/ Richard J. Gonzalez
                                        Richard J. Gonzalez